# Clark, Appellant, *v.* Philadelphia Rapid Transit Co.

*Negligence—Street railways—Personal injuries—Death—Evidence—Fall of pole—Master and servant.*

In an action of trespass to recover damages for the death of plaintiff's husband, it appeared from plaintiff's evidence that deceased, who was the conductor of an ash car belonging to defendant street railway company, was endeavoring to connect the trolley pole of his car, which was on a siding, with the overhead wire of the main track, in order to run his car thereon, that the pole was caught between the guard wire and the running wire, and that deceased, in attempting to disentangle the pole, pulled upon the rope attached thereto and the mechanism fell upon deceased, killing him. The plaintiff offered no evidence of the cause of the accident, but it appeared from defendant's evidence that it must have been due to the catching of the pole in the overhead wire, and that the fastening of the pole was of proper manufacture and in good condition. *Held,* that the court was correct in entering judgment for defendant non obstante veredicto.

Argued April 2, 1913. Appeal, No. 357, Jan. T., 1912, by plaintiff, from judgment of C. P. No. 4, Philadelphia Co., Dec. T., 1908, No. 1045, for defendant non obstante veredicto, in case of Annie Clark, who sues for herself as well as for her minor children, Thomas J. Clark and James Clark, v. Philadelphia Rapid Transit Company. Before FELL, C. J., POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Trespass to recover damages for the death of plaintiff's husband. Before CARR, J.

The opinion of the Supreme Court states the facts.

The jury found a verdict for plaintiff for $9,750. The court subsequently entered judgment for defendant non obstante veredicto.

*Error assigned,* among others, was in entering judgment for defendant non obstante veredicto.

*Victor Frey,* with him *Augustus T. Ashton* and *Warren C. Graham,* for appellant.

*Sydney Young,* for appellee.

OPINION BY MR. JUSTICE POTTER, June 27, 1913:

This is an appeal from a judgment entered for the defendant by the court below non obstante veredicto. We have carefully considered the argument of counsel for appellant, and in the light of the theories advanced, have examined the evidence to ascertain if the action of the court was warranted. It does not appear that the testimony offered in behalf of the plaintiff in this case, as disclosed by the record, shows any adequate moving cause for the disturbance of the apparatus which by its fall brought about the lamentable accident which occurred. It does appear that James Clark who was employed as conductor of a freight car of the defendant company, pulled a trolley pole and part of its attachments, from the top of the car down upon himself, inflicting fatal injuries. But in what way the pole became loosened from its base, or unseated from the spindle upon which it rested so as to permit of its falling or being pulled from the car, was not in any reasonable way explained by witnesses for the plaintiff. As indicated by counsel for appellant, in his accurate description of it, the apparatus may be regarded as made up of two parts: one a cylindrical plate bolted rigidly to the roof of the car, in the center of which plate an upright spindle about eight inches in height rises; the other part of the appliance consists of a long pole which reaches to the overhead wire, this pole being socketed at the bottom at one side of a hollow cylindrical metal sleeve; on the opposite side of the sleeve are fixed a group of eight springs, which are also fastened to this pole and create a strong tension for the purpose of keeping the pole in contact with the overhead trolley wire. This cylindrical sleeve is slipped over and down

upon an upright spindle, and is seated snugly thereon, having sufficient play to admit of a rotary motion, as occasion for reversing the trolley pole may arise. That in the use of the car the trolley pole will be frequently drawn down and shifted or reversed, is, of course, expected, and the appliance is designed for that purpose, a rope being attached to bring the pole within reach of the conductor; the tension of the springs being always against the pull of the rope, and intended to restore the pole to its effective position in contact with the overhead wire, and to keep it there. At the time of the accident, the car in question had been switched to a siding to permit a passenger car to pass. Over this siding no overhead trolley wire was stretched, so that in order to obtain current to start the car it became necessary to swing the trolley pole over to the trolley wire which was above the adjoining track. The motorman in charge of the car testified that he took the pole and placed it in contact with the live wire, and handed the rope to Mr. Clark, the conductor. The motorman then got on the front of the car and started it. When he had gone a short distance he said he heard the rattle of the pole and looked back and saw Mr. Clark lying on the street with the pole across his chest. The trolley pole had manifestly been lifted from its base up and away from the eight-inch-high spindle, and had fallen from the car. But by what power the apparatus was raised, and this heavy device lifted from its seat upon the spindle, the motorman who was testifying in behalf of the plaintiff, did not indicate. Nor was he interrogated as to this important point. He testified that shortly before the accident, at the complaint of the conductor, who said the pole worked "very stiff" he got up on the car and oiled the pole so that it would work easily. He said that at that time the pole was in every way in good condition. This motorman and the conductor, Mr. Clark who was killed, had worked on this car all of the previous day and all forenoon of the day on which the

accident occurred, and during that time the trolley pole was drawn down and shifted many times. No witness for plaintiff explained the unseating of the pole from its base, nor made any suggestion as to how it was raised upon and over the spindle, without which it could not have been separated from the car. One witness, Rickaby, testified that he saw the conductor pull twice on the rope, and then the whole thing came down and struck him in the forehead. He said the car was moving at the time. Another witness, Julia Finegan, said she did not notice how many times the conductor pulled at the rope, but when the car started a little the pole came off and hit the man on the head. The theory advanced on behalf of plaintiff was that the conductor standing below the level of the roof of the car, by pulling downward upon the rope attached to the upper end of the trolley pole, forced the pole, together with its springs and attachments, up and over the spindle some eight inches high upon which it was seated. But an examination of the apparatus shows the impossibility of this theory, owing to the lack of a fulcrum upon which the trolley pole could rest to give it the required lifting force. In the absence of a fulcrum, the effect of the pull upon the pole by the conductor would only be to tighten the grip of the sleeve at its base upon the spindle. But in any event the theory becomes unimportant for the reason that there was positive and uncontradicted evidence introduced by the defendant which showed the actual cause of the accident and the manner of its occurrence. This is found in the testimony of the witness William L. Bowman, the conductor of the passenger car to which the right of way was given by the freight car at the time of the accident. After stating that he was conductor of the passenger car going east, and that he saw the freight car standing on the switch, he said, "And as I got by, my car was stopped there, and I turned around and looked back. Mr. Clark was standing about the middle of the east bound running track and had hold

of the rope. The pole was caught in between the guard wire and the regular running wire, and just about that time the pole came out and down and struck Mr. Clark on the head." And a little later on he repeated the statement that "the pole was fast between the guard wire and the running wire on the east bound track, and it fell right over where Mr. Clark was, at just about the end of the car." This testimony makes clear the fact that the catching of the top of the pole between the guard wire and the regular running wire overhead had the natural effect of lifting the whole apparatus from its base; that is, from the spindle upon which the pole and springs rested. The apparatus could be lifted in this way from its place, just as it would be lifted from the spindle when for any reason it was desired to take it from the car. Once unseated from the spindle, a pull upon the rope by the conductor would naturally and almost inevitably bring the whole thing down upon him. The testimony of this witness which was undisputed afforded a plain and reasonable explanation of the cause of the accident.

Other evidence as to the condition of the cotter pin which was inserted through the head of the spindle upon which the apparatus rested bore out the statement that the whole thing had been violently drawn upward and off the spindle; the ends of the cotter pin were sharply bent upward. Counsel for plaintiff, resting upon the theory above noted that the conductor by pulling upon the pole had forced the sleeve at its base off the spindle, evolved an additional theory that if a washer had been provided and inserted around the neck of the spindle below the cotter pin, the resisting power of the latter would have been greatly increased and the upper part of the apparatus would not have been unseated in the manner in which they supposed that it was separated from its base. But it was shown by the evidence of men thoroughly familiar with the appliance as manufacturers, that when washers were used in the

manner described the purpose was to protect the oil in the spindle and to keep out dirt and dust. Their testimony in this respect showed that the washer was not intended to have any effect in preventing a possible detachment of the trolley pole from its base. The testimony went further than this: for instance, Mr. Weiss, with twenty-six years' experience in working with electrical appliances and thoroughly familiar with the construction of trolley poles and bases, said, "I cannot see why that washer would have any effect on that base being pulled over the spindle." And again, "you could not pull that pole off by a rope on the pole, without it being caught somewhere in the line in the frogs or crossovers, whatever the case might be." Another witness, Shipper, with long experience in the construction of trolley cars, said that the purpose of putting in washers was to protect the oiling surface, and that the pole would not come off its base unless some upward force were applied. He said, "It could not be done by any lower plane than what the article is placed on: for instance, the roof of a car. If a person stands below the roof of the car and is pulling down it would not have any effect in pulling that up from the spindle." It is clear, therefore, that it would be a matter of judgment for the builders of the car to place the point of possible separation where it would be likely to do the least damage in case of such a contingency as the catching of the top of the trolley pole in the overhead wires. Manifestly in such a case something must give way. Unless the trolley pole should do so, at some point in its length, either at the top or bottom, the overhead wiring system would be dragged down by the weight of the ongoing car. It might well be that greater damage would result from this than could be reasonably anticipated from the pulling of the trolley pole from its socket, or from the lifting of the whole apparatus from the spindle upon which it was seated. The happening of such an accident involved a peculiar combination of circumstances,

and the defendant could not fairly have been held to anticipate that even if the trolley pole were drawn from its base, it would be likely to inflict injury such as was shown here. The theory of plaintiff's counsel that the mere pulling down of the trolley pole by the conductor, in the ordinary changes and reversals of the trolley pole, was likely to lift the apparatus from its base and bring it down upon the conductor, was not borne out by the description of the apparatus as given in the evidence, or by any reasonable explanation thereof. The appliance was intended to be used in shifting the trolley pole, and was planned for that purpose. It was intended that the conductor should by means of the rope attached, draw the trolley pole down against the tension of the springs, and rotate the apparatus upon the spindle, as upon an axis. The testimony showed that the conductor did so with this identical apparatus many times in the course of his work. An examination of the parts of the apparatus demonstrates the unsoundness of the theory that a pull downward by the conductor upon the pole would unseat it, for the plain mechanical reason, as stated above, that there is no fulcrum between the point on the pole where the power was applied, and the weight which was to be overcome. Therefore, such a pull as the conductor would give to the pole would only make the sleeve bind more tightly upon the spindle. It could not raise the pole and its attachments, which were heavy, from the base upon which they snugly rested. To do so would require a strong lifting force from above, such as would be supplied in case the upper end of the pole caught in the overhead wires, while the heavy car moved on. This was just what did occur in the present case. In view of the testimony of the eye witness who described the manner in which the upper part of the apparatus was in fact caught in the overhead wires and lifted from its base, it is unnecessary to consider any of the hypothetical testimony offered to show how the accident might have occurred. It was

shown that after the accident nothing was found out of order in the trolley pole, the springs or the sleeve; and the apparatus was replaced in position apparently as good as ever, with the exception of a slight bend in the flange of the small wheel at the upper end of the pole, which was naturally accounted for by the catching of the wheel in the crotch of the overhead wires.

The testimony rejected by the court below, of which complaint is made in the second, third and fourth assignments of error was, we think, immaterial, and was properly excluded. As to the admission in evidence of the inspection sheets or reports, of which complaint is made in the fifth assignment, they do not seem to have been properly identified, but their effect was not harmful as it was merely corroborative, and was not important. The admission of the sheets in evidence did not amount to reversible error. Our examination of the testimony as disclosed by the whole record, leads us to agree with the conclusion reached by the court below.

The assignments of error are overruled, and the judgment is affirmed.